## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAREE ABDULLAH, | : | |
| A/K/A GRENILE GAINEY | : | |
| JARMAINE TRICE, | : | |
| A/K/A ERIC GREENE | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 22- 04143 |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| YVONNE RUIZ, JOSEPH WALSH, | : | |
| ANTHONY TOMAINO, | : | |
| JOHN DOE(S), | : | |
| Individually and as employees for the | : | |
| City of Philadelphia, | : | |
| Defendants. | : | |

### AMENDED COMPLAINT

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Naree Abdullah and Plaintiff Jarmaine Trice spent twenty-seven years in prison after the Philadelphia Police and Assistant District Attorneys violated their Constitutional rights at trial. In March 1996, Plaintiff Naree Abdullah and Plaintiff Jarmaine Trice were tried jointly with two other co-defendants for participation in a December 1993 robbery of a grocery store in which 16-year-old codefendant Julius Jenkins shot and killed the store owner Francisco Azcona. At that trial, the Assistant District Attorney introduced the redacted statements of codefendants Atil Finney and Gregory Womack in violation of *Bruton v. United States*, 391 U.S. 123 (1968) and *Gray v. Maryland*, 523 U.S. 185, 196 (1998) and engaged in deliberate deception by concealing and/or suppressing material evidence. Due these constitutional violations, Plaintiff Naree Abdullah and Plaintiff Jarmaine Trice were both sentenced to life without the possibility of parole.

2.      Twenty-seven years later, upon consideration of Plaintiff Abdullah's and Plaintiff Trice' respective Motion for Summary Reversal and Post Conviction Relief Action petitions, their convictions were finally vacated.

3.      Philadelphia Police and District Attorneys undermined the fairness of the Plaintiffs' trial and the validity of the jury's verdict. Plaintiffs bring this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants Yvonne Ruiz, Joseph Walsh, Anthony Tomaino, and Doe(s), who engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers and Assistant District Attorneys, denied the Plaintiffs due process of law and a fair trial. The actions and conduct of the defendants were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers and Assistant District Attorneys and Police officers, and the failure to take disciplinary and remedial action against the defendants and others who commit serious misconduct and abuses of authority.

## II.      **JURISDICTION**

4.      This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

## III.      **PARTIES**

5.      Plaintiff Naree Abdullah, a/k/a Gernile Gainey ("Plaintiff Abdullah") is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

6.      Plaintiff, Jarmaine Trice a/k/a Eric Greene ("Plaintiff Trice") is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

7.      Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia District Attorney's Office and the Philadelphia Police Department. At all times relevant, the Philadelphia District Attorney's Office and/or the Philadelphia Police Department employed Defendants Yvonne Ruiz, Joseph Walsh, Anthony Tomaino, and Doe(s),

8.      Defendants Yvonne Ruiz and John Doe(s) (the defendant ADA's) were at all times relevant to this action Assistant District Attorneys acting under color of state law. Defendant Ruiz is being sued in her individual capacity.

9.      The designation "John Doe" is one of a fictious person or entity.

10.     Defendants Joseph Walsh and Anthony Tomaino, ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law. The defendant officers are being sued in their individual capacities.

11.     At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiffs of their constitutional and statutory rights.

**IV.    FACTUAL ALLEGATIONS**

12.     On December 11, 1993, a group of young men robbed a small neighborhood grocery store in North Philadelphia.

13.     One of the young men shot Francisco Azcona, the store's owner, who died shortly thereafter.

14.     The men took the store's cash register and escaped in a station wagon parked

3

nearby.

15.     Over a year later, in February and March of 1995, the police questioned Plaintiff Trice, Plaintiff Abdullah, and several other young men about the grocery store incident.

16.     Neither Plaintiff Abdullah nor Plaintiff Trice ever confessed or gave a statement about the crime.

17.     Police obtained confessions to the crime from three men: Julius Jenkins, Atil Finney, and Gregory Womack.

18.     Police also obtained a statement from Demond Jackson, who said that he was with the robbers before and afterward but did not participate.

19.     All four statements identified Jenkins as the shooter and claimed that Plaintiffs participated in the robbery. But their accounts differed significantly.

20.     The Commonwealth charged Jenkins with first-degree murder and Plaintiff Trice, Plaintiff Abdullah, Finney, and Womack, with second-degree murder.

21.     Jackson was not charged with any crime related to the grocery store robbery.

22.     Finney, Jenkins, Abdullah, Womack, and Trice were tried jointly.

23.     Plaintiffs Trice and Abdullah were found guilty of second-degree murder, and the court sentenced them to life imprisonment without the possibility of parole.

24.     The Commonwealth's case at trial rested on the testimony of one witness against the five: Demond Jackson, an uncharged admitted participant, who testified that he was present before and after the crime but did not participate.

25.     At trial, Defendant Ruiz alleged that four men (Finney, Jenkins, Abdullah and Trice) went into the store, while Womack (the driver) and Jackson remained in the car.

**<u>Jackson's False Testimony</u>**

4

26.     Jackson testified, contrary to his statement, that four men – Plaintiff Trice, Plaintiff Abdullah, Finney, and Jenkins – entered the grocery store, he and Womack remained in Womack's station wagon, and when the others returned, Plaintiff Trice was carrying the cash register.

27.     After Jackson had his credibility impeached on cross examination on the basis of his three inconsistent statements, Defendant Ruiz salvaged his testimony by knowingly eliciting false testimony from Jackson that any inconsistencies were the product of nervousness because this was his first time testifying in a homicide trial.

28.     In fact, Jackson testified in a homicide trial *less than a year before* his testimony in the Plaintiffs' case in <u>Commonwealth vs. Abdul Yusuf Hardy</u>, CP-51-CR-0428571, 0428591, 0428551, 0428501-1993.

29.     Defendant Ruiz intentionally elicited the following false testimony:

Q: Was that the first time, Sir, that you had to testify against someone in a case where a homicide was involved?

A: Yes.

Q: Okay. And is that what made you nervous, the fact that it was a homicide?

A: Yes.

30.     In 2016, Womack learned of Jackson's prior homicide testimony when another prisoner shared it with him and raised the issue in a successor PCRA as a *Brady* claim.

31.     The District Attorney's office opposed Womack's petition, and the Court dismissed Womack's claim.

32.     Though Womack's claim was unsuccessful, the District Attorney's Office was placed on notice that false testimony was used in Plaintiffs' trial.

33.     In 2017, both Plaintiffs Abdullah and Tricea also raised the fact that Demond Jackson lied at trial in PCRA filings.

34.    Despite this notice, Defendant Doe(s) continued to oppose Plaintiffs' petitions for relief.

35.    The failure of the Defendants Ruiz and Doe(s)  to correct the testimony of the witness which she knew to be false denies petitioner due process of law in violation of the Fourteenth Amendment. The principle that a State may not knowingly use false testimony to obtain a tainted conviction does not cease to apply merely because the false testimony goes only to the credibility of the witness. *Napue. V Illinois*, 360 U.S. 264 (1959).

36.    Defendants Ruiz and Doe(s) were under a continuing obligation to correct the perjured testimony and should have recognized its obligations under *Napue*. Instead, they remained silent, opposed relief, and successfully kept the Plaintiffs in prison.

### Undisclosed *Brady* Material in the files of the Prosecutor and Police

37.    Jackson also testified that he remembered the night of the Azcona murder because he had been shot in the hand later in the evening during a bar robbery (which he denied involvement in), a short distance away from the Azconas' food market.

38.     Defendant Walsh testified that he investigated the incident both before and after speaking with Jackson and that there were no related incident reports around the area.

39.    Defendant Walsh testified that he went over the file when Defendant Tomaino turned the case over to him, saying he reviewed "just about everything in that file, we would go over and over it and over it…."

40.    Defendant Walsh testified that he reviewed incident reports for the date of the murder in North Central Division and checked with the detectives to see if there was "any type of incident like this," but that he was "unable to find the incident."

41.    Plaintiffs' trial counsel requested that any incident reports regarding the e robbery be produced in discovery. In response to that request, Defendant Ruiz told the court "I had police

officers looking to see if there were any [incident reports] for that day it occurred, and they couldn't find anything there." When defense counsel argued that the police could have gone to the bar and asked the bartender if he was robbed, Defendant Ruiz falsely told the court that "they don't know what bar it was."

42.    When testifying at trial, Defendant Tomaino was unequivocal that investigators had not found anyone in the neighborhood with information about the robbery, testifying that "if there had been positive reports, they would have been written up, sir. There were none." A positive report, he added, would be "anything that we can go back to later on and say it's something that may have to be looked at, it would have been recorded."

43.    Post-conviction inspection of Defendant Ruiz's file revealed the existence of incident reports regarding the bar robbery that the individual defendants previously claimed to have no information about. These incident reports were intentionally suppressed by the individual defendants in violation of *Brady*.

44.    Post-conviction inspection of the homicide file revealed a previously undisclosed report reflecting that "kids on the block by store saying Keith did it." A police radio report stated that an anonymous caller said "Keith" was the killer at 3000 York Street.

45.    Post-conviction inspection of the homicide file revealed that Homicide investigators received a call the day after the murder from someone stating that an individual named Michael Lee told her: "We got the cash register, and Mohammad shot him in the face."

46.    Post-conviction inspection of the homicide file revealed that two additional notes in the homicide file name Keith Alexander as a suspect.

47.    The undisclosed reports also reflect that Thomas Drummond, who provided information against the Plaintiffs, was arrested for the bar robbery the day before he contacted

police.

48.     This evidence of both alternative suspects and the existence of additional

witnesses were never produced to Plaintiffs' trial counsel in violation of *Brady*.

49.     The individual defendants' intentional failure to produce *Brady* material related to

the investigation of the bar robbery and/or correct the false testimony of Jackson deprived

defense counsel of the opportunity to impeach the account of the Commonwealth's primary

witness, prevented defense counsel from arguing that Jackson testified to escape prosecution for

the bar robbery, and obscured the existence of potential alternative suspects.

50.     Had the reports been disclosed, trial counsel could have impeached Jackson with

the fact that he was not charged in connection with the robbery of the bar; and could have

impeached Jackson's account of events surrounding the Azcona murder.

## The Redacted Statements

51.     Prior to trial, Plaintiff Trice's trial counsel moved to sever his trial from his co-

defendants, arguing that *Bruton v. United States*, 391 U.S. 123 (1968), prohibits the introduction

of a non-testifying co-defendant's confession in a joint trial.

52.     Instead of severing the trials, the court asked the Defendant Ruiz to redact the co-

defendants' statements to remove the prejudicial references to Plaintiff Trice.

53.     Defendant Ruiz redacted the statements; however the redactions were not

uniformly made.

54.     Defendant Ruiz went to great lengths to tailor that narrative by presenting the

false testimony of Jackson and Defendant Tomaino and misrepresenting witness accounts about

the number of people in the store.

55.     Defendant Ruiz, used the co-defendant statements against Plaintiff Trice and

Plaintiff Abdullah repeatedly arguing that they corroborated Jackson's testimony.

56.    The admission of the redacted statements from violated Plaintiffs' right to a fair trial.

57.    These uses of the co-defendant statements are prohibited by *Bruton*, and its progeny.

58.    For nearly three decades, Defendant Ruiz and later ADA Doe(s) violated *Brady v. Maryland* by withholding multiple pieces of favorable evidence.

**Post-Trial Proceedings**

59.    Following their convictions, Plaintiffs each continued to fight their wrongful convictions.

60.    In March 1998, while Plaintiff Abdullah's case was on direct appeal, *Gray v. Maryland* was decided, squarely holding that redacted statements precisely like the ones introduced in this case were unconstitutional under *Bruton,* violating the Confrontation Clause.

61.    Instead of acknowledging the clear constitutional error and agreeing to Plaintiffs' petition for relief, Defendants Ruiz and Doe(s) opposed relief for Plaintiffs for over two decades.

62.    On April 20, 2021, Mr. Abdullah was finally granted relief from the United States Court of Appeals for the Third Circuit on this issue. Mr. Abdullah's petition for habeas corpus relief was granted, overturning his conviction and ordering that he be released or retried within 120 days.

63.    Defendant Doe(s) failed to retry Mr. Abdullah within the 120-day period provided by the federal court order and instead, pursued a plea agreement.

64.    Defendant Doe(s) first offered Abdullah a plea deal for him  to serve 26-52 years. Mr. Abdullah rejected the plea offer.

65.    Defendant Doe(s) then made Mr. Abdullah an offer of time-served while he was still incarcerated.

66.     The two plea offers were made without providing defense counsel the *Brady* material contained in its files.

67.     Mr. Abdullah was confronted with two options: remain in custody for up to three more years pending a new trial or enter a plea to a reduced charge for a prison sentence of less time than he had already served.

68.     Mr. Abdullah was constructively coerced by the Philadelphia District Attorney's Office to enter a plea of guilty to robbery and criminal conspiracy when faced with the prospect of remaining in jail for an undetermined period to await a new trial, even though he was confident that he would be successful in gaining an acquittal at trial.

69.     On January 5, 2022, Mr. Abdullah entered a guilty plea to robbery and criminal conspiracy and was sentenced to 10 to 20 years of state incarceration, however, since Mr. Abdullah received credit for twenty-seven years he previously served as a result of the conduct of the defendants, he was released from the courtroom and returned home to his family.

70.     On January 24, 2022, an order vacating the conviction of Mr. Trice was finally granted citing Mr. Abdullah's relief and their identical circumstances, newly discovered evidence withheld in violation of *Brady* and *Napue*, including contemporaneous reports that fewer than four people entered the market contradicting the Commonwealth's case that four men entered the store, evidence of alternative suspects, and a report of a bar robbery on the same night and in the vicinity of the crime contradicting the testimony of Detective Walsh and the argument of trial prosecutor Ruiz.

71.     Like Mr. Abdullah, Mr. Trice was confronted with two options: remain in custody for up to three more years pending a new trial or enter a plea to a reduced charge for a prison sentence of less time than he had already served. Trice chose the latter.

72.     Mr. Trice was constructively coerced by the Philadelphia District Attorney's Office to enter a plea of guilty to robbery and criminal conspiracy when faced with the prospect of remaining in jail for an undetermined period to await a new trial, even though he was confident that he would be successful in gaining an acquittal at trial.

73.     On January 24, 2022, Mr. Abdullah entered a guilty plea to robbery and criminal conspiracy and was sentenced to 10 to 20 years of state incarceration, however, since Mr. Abdullah received credit for twenty-seven years he previously served as a result of the conduct of the defendants, he was released from the courtroom and returned home to his family.

74.     The actions and conduct of the individual defendants as described above violated the plaintiffs' Fourteenth Amendment right to due process of law and a fair trial.

75.     The defendant officers and Assistant District Attorney(s) were deliberately deceptive by concealing and/or suppressing critical evidence and thus violated the plaintiff's right to due process of law and a fair trial.

76.     Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Plaintiffs, denied the plaintiffs due process and a fair trial.

77.     The concealment and/or failure to disclose the relevant and material evidence described above violated the plaintiff's right to due process of law and a fair trial.

78.     As a result of the actions and inactions of the defendant officers and Assistant District Attorney, Plaintiffs were compelled to stand trial in a murder case, causing them substantial harms.

<u>The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence</u>

79.     For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Mr. Azcona's murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

80.     This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

81.     These practices were well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

82.     Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of Plaintiffs' 1996 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide Unit

and PPD supervisors or because of their deliberate indifference to this misconduct.

    a.    **Anthony Wright** (CP-51-CR-1131582-1991).  Mr. Wright had been convicted of the rape and murder of an elderly woman based on misconduct by homicide detectives including the tampering with evidence, coercive witness interrogation, planting evidence and numerous other actions that denied Mr. Wright a fair trial. After spending nearly twenty-five years in prison, Mr. Wright was exonerated by DNA evidence.

    b.    **Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Detectives interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances of his statement as follows: the detective held him in custody and interrogated him for three days, without food or water; he was denied use of the bathroom and had to urinate on the floor; the detective hit him several times. After coercing Mr. Sanchez's statement, the detective interrogated Mr. Hernandez and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: the detective had him handcuffed to a chair and held him without water, food, or use of a bathroom; the detective punched him in the face and pressed his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

    c.    **Jackie Combs Jr.** PPD detectives, coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those

witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

d.   **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in South Philadelphia while he was working at a popular and busy restaurant. Mr. Veasy was interrogated by detectives until he provided a "confession." Mr. Veasy has described that the detective isolated him in an interrogation room where the detective smacked him around and kicked his testicles several times until Mr. Veasy agreed to sign the "confession."

e.   **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, the detective obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, the detective coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by the detective. After David Glenn testified regarding the detective's misconduct and disavowed the statement the detective had coerced him to sign, the detective notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case.  Shortly after receiving this letter from the detective's counsel, the prosecution dismissed all charges against St. George, but

the detective remained with the PPD through September 1996.

f.    **Donald Ray Adams** (CP 51-CR-0743812-1991). Mr. Adams was charged and convicted in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false and some years later she recanted. In 2007, the Court of Common Pleas granted post- conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received compensation for his wrongful conviction.

g.    **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was

convicted of murder on the statement of a single eyewitness, Paul Presley—an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

h.   **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him— eventually signing the statement written out in longhand by Det. Devlin. After

hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Defender.

83.    At the time of the investigation and prosecution of Plaintiff in 1993-1996, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

84.    This practice, as exemplified by the investigations in Plaintiffs' case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.  Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

85.    During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent

decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

86.    Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

87.    This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Plaintiffs were charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

88.    In summary, at the time of the investigation and prosecution of Plaintiffs, the PPD had a practice, policy, and custom of:

a.    Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

d.    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e.    Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Plaintiffs.

89.    At the time of the investigation and prosecution of Plaintiffs, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of

the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.    excessive and chronic delays in resolving disciplinary complaints;

b.    a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.    a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.    the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.    the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.    the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.    a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.    serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.    lack of an effective early warning system to identify, track, and monitor "problem" officers;

j.    IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.     IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## V.     CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment**
*Against All Individual Defendants*

90.     Plaintiffs incorporate by reference all the foregoing paragraphs.

91.     The individual defendants, acting individually and in concert, and within the scope of their employment with the City of Philadelphia, deprived Plaintiffs of their clearly established constitutional right to due process of law and to a fair trial when the defendant officers and / or defendant assistant district attorneys deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence linking fewer than four people to the scene of the crime, evidence of alternative suspects, and undisclosed reports of crime on the same night and in the same vicinity implicating Commonwealth witnesses.

92.     The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiffs clearly established constitutional rights.  No reasonable officer or assistant district attorney in 1993-1996 would have believed this conduct was lawful.

93.     Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful trial at which they faced the death penalty, and the harms he sustained as a direct result.

## COUNT II: 42 U.S.C. §1983 Civil Rights Conspiracy
### *Against All Individual Defendants*

94.    Plaintiffs incorporate by reference all the foregoing paragraphs.

95.    The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Plaintiffs of their clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

96.    In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a.    Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements; and

b.    Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe Plaintiffs had committed the crime and ignoring evidence that exculpated Plaintiffs.

97.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiffs' injuries.  Defendants knew, or should have known, that their conduct would result in Plaintiffs' denial of due process and a fair trial.

## COUNT III: 42 U.S.C. § 1983 Failure to Intervene
### *Against All Individual Defendants*

98.    Plaintiffs incorporate by reference all of the foregoing paragraphs.

99.    By their conduct, under color of state law and acting within the scope of their employment with the City of Philadelphia, the individual defendants had opportunities to intervene on behalf of Plaintiffs to prevent the deprivation of liberty without due process of law

and to ensure their right to a fair trial, but with deliberate indifference failed to do so.

100.    The defendants' failures to intervene violated Plaintiffs; clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer  or attorney in 1993-1996 would have believed that failing to intervene to prevent these defendants deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Plaintiffs to be subjected to an unfair trial, were lawful.

101.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiffs' injuries. Defendants knew, or should have known, that their conduct would result in Plaintiffs' unfair trial.

**COUNT IV: 42 U.S.C. § 1983 Municipal Liability Claim**
*Against Defendant City of Philadelphia*

102.    Plaintiffs incorporate by reference all the foregoing paragraphs.

103.    The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Plaintiffs' arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

104.    Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews

and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

105.    The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Plaintiffs trial for capital murder, and the other injuries and damages set forth in this Complaint.

## COUNT V: DAMAGES
*Against All Defendants*

106.    Plaintiffs incorporate by reference all the foregoing paragraphs.

107.    The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Plaintiffs to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

## COUNT VI: PUNITIVE DAMAGES
*Against All Individual Defendants*

108.  Plaintiffs incorporate by reference all the foregoing paragraphs.

109.  The defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the plaintiffs' constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Naree Abdullah and Plaintiff Jarmaine Trice requests the following relief:

a. Compensatory damages to Plaintiffs and against all Defendants, jointly and severally, in an amount to be determined at trial;

b. Punitive damages to Plaintiffs and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest and recovery of Plaintiffs costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims;

d. Any and all other relief to which Plaintiffs may be entitled; and

e. A jury trial as to each defendant and as to each count.


Date: January 11, 2023

**MINCEY FITZPATRICK ROSS, LLC**
*/s/Shawn K. Page*
Shawn K. Page, Esquire PA ID No.: 313227
Kevin V. Mincey, Attorney I.D. No. 90201
Zainab K. Shields, Esquire PA ID No. 321181
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pa 19103
Telephone: 215 - 587 - 0006
Fax: 215 - 587 - 0628
Attorney for Plaintiff