IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NAREE ABDULLAH, a/k/a GRENILE GAINEY and JARMAINE TRICE, a/k/a ERIC GREENE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PHILADELPHIA, et al.,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 22 -4143 |

MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Baylson, J.                                                           March 12, 2025

In connection with their 1996 convictions for second degree murder, Plaintiffs Naree Abdullah and Jarmaine Trice[1] bring this 42 U.S.C. § 1983 ("§ 1983") suit against the City of Philadelphia.  As relevant here, individual Defendants, including Assistant District Attorney Yvonne Ruiz, Detective Tomaino, and Officer Walsh were dismissed from this action.  ECF 50.  Presently before this Court is the City's ("Defendant") Motion for Summary Judgment.  For the following reasons, the Motion is granted in part and denied in part.

I.    FACTUAL BAKGROUND

  A.  Robbery 1 ("Azcona Murder")

On December 11, 1993, a group of men robbed a grocery store in North Philadelphia.  Am. Compl. at ¶ 12, ECF 13.  During the robbery, one participant shot and killed the store's owner.  Id. at ¶ 13.  Three individuals, Julius Jenkins, Atil Finney, and Gregory Womack,

_____

[1] Plaintiff Abdullah previously went by the name Grenile Gainey.  Plaintiff Trice previously went by the name Eric Greene.

eventually confessed to the robbery, identifying Jenkins as the shooter and placing both Abdullah and Trice at the scene of the crime.  Id. at ¶¶ 17, 19.  Demond Jackson, who did not participate in the crime but was with the group before and after, also gave a statement to the police that aligned with those confessions, although each account differed significantly.  Id. at ¶¶ 18–19.  Based on those statements, Jenkins was charged with first-degree murder, and Abdullah, Trice, Finney, and Womack were charged with second-degree murder.  Id. at ¶ 20.

### B.  The Trial

The five co-conspirators were jointly tried in 1996, despite Trice's attempt to sever his case.  Id. at ¶¶ 1, 22, 51.  Ruiz prosecuted the case, and Tomaino and Walsh, who investigated the robbery, testified against Abdullah and Trice.  Id. at ¶¶ 8, 38–40.

### 1.  Ruiz Allegedly Elicits False Testimony from Jackson

Plaintiffs allege that, at trial, Ruiz knowingly elicited false testimony from multiple witnesses, including Walsh and Tomaino.  Id. at ¶¶ 27, 38–42.  First, Plaintiffs allege that Ruiz improperly attempted to salvage Demond Jackson's testimony, which defense counsel had impeached as inconsistent with Jackson's original statement to the police.  Id. at ¶ 27.  Specifically, Plaintiffs contend that Ruiz elicited rebuttal testimony from Jackson in which Jackson attributed his inconsistencies to nerves, given that it was Jackson's first time testifying in a homicide trial.  Id.  In actuality, Jackson had previously testified in a homicide trial less than a year earlier, a fact that Ruiz allegedly knew.  Id. at ¶ 28.

### C.  Robbery 2: Ruiz Allegedly Elicits False Testimony from Walsh and Tomaino

Second, Plaintiffs allege that Ruiz elicited false testimony from Walsh and Tomaino. Plaintiffs contend that Walsh and Tomaino knowingly lied in rebutting Jackson's further testimony that he had been shot during a different bar robbery later that same evening.  Id. at ¶¶

2

37–40.[2]  Walsh testified that he had thoroughly investigated the second incident but had been unable to find any reports of a bar robbery.  Id. at ¶¶ 38, 40.  Likewise, Tomaino testified that he had searched for, but not found, any reports regarding a bar robbery.  Id. at ¶ 42.  Ruiz herself also allegedly maintained throughout discovery and at trial that she "had police officers looking to see if there were any [incident reports] for that day it occurred, and they couldn't find anything there."  Id. at ¶ 41.

Contrary to that testimony, however, Plaintiffs' review of Ruiz's case file during post-conviction proceedings revealed several incident reports related to the bar robbery.  Id. at ¶ 43.  Ruiz's case file further revealed two alternative suspects and several additional witnesses.  Id. at ¶¶ 44–47. Those additional case files, Plaintiffs contend, demonstrate that (1) Ruiz knowingly elicited false testimony from Walsh and Tomaino, (2) Walsh and Tomaino knowingly falsely testified, and (3) Walsh, Tomaino, and Ruiz had conspired to conceal these files, which constituted Brady material.  Id. at ¶¶ 75, 91.

**2.  Ruiz Allegedly Introduces Improperly Redacted Statements**

Plaintiffs also direct the Court to Ruiz's alleged misconduct with respect to the pre-trial confessions from Jenkins, Finney, and Womack.  Id. at ¶¶ 51–58.  As noted above, the three co-conspirators submitted statements that also inculpated Abdullah and Trice.  Id. at ¶ 19.  But Jenkins, Finney and Womack did not actually testify at trial.  Id. at ¶ 51.  And instead of omitting those statements or severing each defendant's case, the trial judge asked Ruiz to simply redact those confessions to remove any prejudicial references to Abdullah and Trice.  Id. at ¶ 52.  Ruiz did so, but allegedly redacted the various statements inconsistently, after which she used them

---

[2] Plaintiffs appear to assert that these reports may have demonstrated that Jackson's testimony was coerced or given in exchange for the Commonwealth abstaining from prosecuting Jackson for the bar or grocery store robbery.  ECF No. 37-1 at 6; Am. Compl. at ¶ 49.

against both Abdullah and Trice to corroborate Jackson's inculpating testimony.  Id. at ¶¶ 53–55.
That evidence, Plaintiffs contend, heavily contributed to their allegedly wrongful
convictions.  Id. at ¶ 56.

### D. Post-Trial Proceedings

In the ensuing decades, Abdullah and Trice challenged their convictions on direct appeal
and through post-conviction proceedings.  Id. at ¶¶ 59–62.  Abdullah did so with two principal
arguments.  First, he asserted that redacted statements, like those introduced at trial, violate the
Confrontation Clause under Bruton v. United States, 391 U.S. 123 (1968) and its progeny.  Id. at
¶¶ 57, 60, 62.  In particular, he argued that Gray v. Maryland, 523 U.S. (1998), which the
Supreme Court decided while Abdullah's case was on direct appeal, "squarely [extended
Bruton to] redacted statements precisely like the ones introduced" by Ruiz at Plaintiffs'
trial.  Id. ¶ 60.  Second, Abdullah argued that Defendants' use of false testimony, which was
allegedly known to be false by these Commonwealth representatives, was a denial of due process
under Napue v. People of State of Ill., 360 U.S. (1959).  Id. ¶¶ 35, 70.

Abdullah's Bruton/Gray argument eventually persuaded the Third Circuit, which granted
a summary reversal of Judge Ditter's denial of post-conviction relief on November 24, 2020,
followed by a grant of habeas relief by Judge Pratter on April 8, 2021.  Id. at ¶¶ 60, 62.[3]  In 2022,
Trice, relying on "Abdullah's relief and their identical circumstances," also had his conviction
vacated on Brady and Napue grounds, id. at ¶ 70, although the Amended Complaint does not
identify the precise court, order or judge vacating that conviction, id.

Following the respective grants of habeas relief for Plaintiffs in 2021 and 2022, Plaintiffs
allege that certain members of the Philadelphia DA's office (although not Ruiz in particular)

---

[3] See Abdullah v. Warden Dallas SCI, et al., No. 16-4149, ECF No. 125 (3d. Cir. 2020); Abdullah v. Warden Dallas
SCI, et al., No. 06-3885, ECF No. 57 (E.D. Pa. 2021).

failed to release or retry the Plaintiffs within 120 days, and then "constructively coerced" Plaintiffs to accept new plea deals which led to prison sentences in the Court of Common Pleas for less time than already served, rather than wait for a new trial.  Id. at ¶¶ 63–68, 70–73. Following their 2022 guilty pleas for robbery and criminal conspiracy, Plaintiffs filed the present suit.

## II.    <u>PROCEDURAL HISTORY</u>

Plaintiffs filed their initial Complaint on October 14, 2022, bringing claims against the City of Philadelphia as well as individuals including Walsh, Tomaino, and Ruiz.  ECF 1.  On December 7, 2022, Defendant City of Philadelphia filed a Motion to Dismiss for Failure to State a Claim.  ECF 8.  Plaintiffs then filed an Amended Complaint on January 11, 2023, ECF 13, bringing the following six claims under 42 U.S.C. § 1983:

- **<u>Count I</u>**: Deprivation of liberty without due process of law and denial of a fair trial under the Fourteenth Amendment, against all individual Defendants, for deliberately deceiving, concealing and/or suppressing material evidence;

- **<u>Count II</u>**: A civil rights conspiracy claim, against all individual Defendants, for agreeing to deprive Plaintiffs of their Fourteenth Amendment rights to due process of law and a fair trial;

- **<u>Count III</u>**: A failure to intervene claim, against all individual Defendants, for failing at trial and post-conviction proceedings to prevent the deprivation of Plaintiffs' Fourteenth Amendment rights to due process and a fair trial;

- **<u>Count IV:</u>** A municipal liability claim against the City of Philadelphia for the Philadelphia Police Department's (PPD) pattern, practice, or custom of unconstitutional conduct in criminal investigations;

5

- **Count V**: Damages against all Defendants;

- **Count VI**: Punitive Damages against all individual Defendants.

On February 1, 2023, the City filed a Motion to Dismiss Plaintiffs' Amended Complaint, ECF 15, which was denied on April 24, 2023, ECF 18. On July 31, 2023, Tomaino and Walsh filed a Motion to Dismiss. ECF 36. On August 16, 2023, Ruiz filed her own Motion to Dismiss. ECF 40. On November 29, 2023, both Motions were granted and Tomaino, Walsh, and Ruiz were dismissed from the case. ECF 50.

The City filed the present Motion for Summary Judgment on July 29, 2024. ECF 79. On August 12, 2024, Plaintiffs filed a Response, ECF 81, and on August 19, 2024, the City filed its Reply, ECF 82. This Court notes at the offset that this case has been riddled with discovery disputes. Plaintiffs' Response largely detailed the City's alleged non-compliance with Plaintiffs' discovery requests and how that hindered their ability to defend against summary judgment. Following briefing, on August 21, 2024, this Court granted in part Plaintiffs' July 9, 2024, ECF 71, and July 12, 2024, ECF 73, Motions to Compel. In pertinent part, this Court ordered Plaintiffs to file a list detailing the role in the alleged wrongful conduct for each proposed deponent and permitted each party to file a supplemental summary judgment brief within ten days of the ordered discovery's completion. ECF 84. The parties then submitted letters to this Court, ECF 85, 86, presenting competing views on how discovery in the case had progressed thus far.[4]

Over the ensuing months, the parties continued to clash over discovery. On October 16, 2024, this Court granted the relief requested in Plaintiffs' Supplemental Motion to Compel, ECF

---

[4] The parties appear to have misunderstood this Court's Order and filed their first supplemental briefs within ten days of the Order, on September 12, 2024, and September 18, 2024, respectively, as opposed to within ten days of the discovery's completion. ECF 87, 89. These briefs are hereinafter referred to as the parties first supplemental briefs.

92, and provided Plaintiffs with thirty days to depose Walsh and Tomaino as well as Officers

Gross and Snell.  ECF 96.  To the best of this Court's knowledge, the depositions of Walsh and

Gross were scheduled for October 30, 2024, which on short notice Plaintiffs' counsel was unable

to attend.  On October 31, 2024, the City filed a Motion for a Protective Order, ECF 97, to

preclude Plaintiffs from deposing Walsh and Gross at a later date, that this Court denied on

November 18, 2024.  ECF 104.  Two months after entry of the Order, on January 16, 2024, this

Court ordered the depositions to be completed by February 15, 2025, and for the parties to

submit supplemental briefs regarding the Motion for Summary Judgment by February 25, 2025.

ECF 105.  The parties were unable to agree on a schedule.  To date, Walsh and Gross have not

been deposed.  On February 25, 2025, the parties filed their supplemental summary judgment

briefs.  ECF 106, 107.[5]

## III.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual

dispute is "material" if it might affect the outcome of the case under governing law.  <u>Id</u>.

A party seeking summary judgment always bears the initial responsibility for informing

the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular

issue at trial, the moving party's initial burden can be met simply by "pointing out to the district

---

[5] These briefs are hereinafter referred to as the parties' second supplemental briefs.

court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, by "citing to

particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ.

P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a

factual showing "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under

Rule 56, the Court must view the evidence presented on the motion in the light most favorable to

the opposing party. Anderson, 477 U.S. at 255.

## IV. DISCUSSION

### A. Underlying Constitutional Claim: Deliberate Deception

Plaintiffs bring a deliberate deception claim, in violation of the Fourteenth Amendment.

Plaintiffs argue that PPD officers and Ruiz introduced false testimony and withheld exculpatory

evidence during their 1996 murder trial. Am. Compl. at ¶ 91.

As a preliminary matter, this Court previously found that the individual PPD officers

were entitled to qualified immunity and that Ruiz was entitled to absolute immunity. See Gainey

v. City of Phila., 704 F.Supp.3d 589, 601-02 (E.D. Pa. 2023) (Baylson). This Court may find that

the City is liable, even in the absence of individual Defendants' liability, where the individual

Defendants committed a constitutional violation but were shielded by qualified or absolute

immunity.[6]

---

[6] See Mervilus v. Union Cnty., 73 F.4th 185, 196-97 (3d Cir. 2023) ("A municipality can be held liable under Monell, even when its officers are not, unless such a finding would create an inconsistent verdict . . . Where it is possible for the Monell defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the Monell defendant liable." (cleaned up) (internal citations omitted); Fullman v. City of Phila., 2016 WL 7383194, at *9 (E.D. Pa. Dec. 20, 2016) (Robreno), aff'd in part, vacated in part on other grounds, 722 F. App'x 242 (3d Cir. 2018) ("whether [ ] individual officers might be protected by qualified immunity is a separate and distinct question that does not bear on the Court's treatment of Plaintiff's claims against the City.").

### 1. **Guilty Pleas**

The City argues that by virtue of their guilty pleas Plaintiffs remain legally guilty for their participation in the Azcona murder and that their guilt materially undermines their deliberate deception claim. City's Motion for Summary Judgment ("MSJ") at 9-10.

The Heck doctrine precludes plaintiffs in § 1983 suits from bringing an action for damages where it would "necessarily imply the invalidity of [the plaintiff's] conviction." Heck v. Humphrey, 512 U.S. 477, 487 (1994). However, Heck does not apply where the original conviction is vacated. See Poventud v. City of New York, 750 F.3d 121, 134 (2d Cir. 2014). Where the original conviction is vacated, the subsequent conviction is presumed to be free of the misconduct alleged in the original conviction. Id. For example, in Dennis v. City of Philadelphia, the plaintiff's deliberate deception claim did not imply the invalidity of his subsequent third-degree murder conviction because his first-degree murder conviction was vacated. 2024 WL 3904046, at *3 (E.D. Pa. Aug. 22, 2024) (Sánchez).

Likewise, Plaintiffs' deliberate deception claim does not "necessarily imply the invalidity of the challenged conviction in the trial[,]" because Plaintiffs' 1996 second degree murder convictions were vacated. Subsequently, in 2022, Plaintiff Gainey pled nolo contendere to robbery and conspiracy and Plaintiff Trice pled guilty to robbery and conspiracy. City's Statement of Undisputed Facts ("City's Facts") at ¶¶ 36, 41, 44.

### 2. **False Testimony**

Plaintiffs contend that Jackson, Walsh, and Tomaino proffered false testimony. Plaintiff's Amended Complaint ("Am. Compl."). at ¶ 26-28, 38-40, 42. The City denies that any witness testified falsely. MSJ at 11-13.

### i.    Jackson's Testimony

Plaintiffs argue that Jackson was clearly lying during his trial testimony because he explained away the inconsistencies in his testimony as nerves due to it being his first time as a witness, when he had in fact previously testified.  Am. Compl. at ⁋ 27-29.  To rebut Plaintiffs' claim, the City contends that Plaintiffs were aware that Jackson had previously been a witness and Jackson testified to his prior experience as a witness at Plaintiffs' trial, so Plaintiffs could have cross-examined Jackson on this issue.  MSJ at 12.

Plaintiffs insinuate that they only learned of Jackson's prior witness experience in 2016 through co-defendant Womack.  Plaintiff's Response to MSJ ("Resp.") at 7.  Defendant asserts that Plaintiffs knew that Jackson had previously testified no later than March 4, 1996.  MSJ at 12.  However, the relevant inquiry is not when Plaintiffs learned of Jackson's prior testimony but whether Jackson proffered false testimony.  The record supports Plaintiffs' broader argument that Jackson proffered false testimony.  Jackson answered in the affirmative, when asked by Ruiz "is that what made you nervous, the fact that it was a homicide?"  Id.  Ruiz's questioning implies that Jackson made inconsistent statements.  Whether the inconsistencies in Jackson's testimony rise to the level of false testimony is a disputed issue of material fact that cannot be decided at summary judgment.

### ii.    Walsh and Tomaino's testimony

Plaintiffs also contend that Walsh and Tomaino testified that they investigated the bar robbery that occurred the same night as the Azcona murder ("second bar robbery) and found no reports of the incident, but that a post-conviction inspection of Ruiz's case file revealed incident reports regarding the second bar robbery.  Am. Compl. at ⁋⁋ 38-43.  The City argues that Walsh and Tomaino neither concealed evidence nor testified falsely because (a) Walsh testified that he went to North Central Detectives to search for incident reports of the second bar robbery, but

found none, (b) Tomaino's testimony was devoid of any reference to the second bar robbery, and (c) information regarding the second bar robbery was provided to Plaintiffs' trial attorney during Jackson's cross-examination. MSJ at 13. As this Court noted in its Memorandum dismissing Walsh and Tomaino from this action, Ruiz's possession of the incident reports creates an inescapable inconsistency. See Gainey, 704 F.Supp.3d at 601 ("disclosure to the prosecution belies any conclusion that, to the extent Officer Defendants knew of the reports, they attempted to hide that information from the prosecution."). Whether Walsh or Tomaino proffered false testimony cannot form the basis of Plaintiffs deliberate deception claim.

### 3. Concealed Evidence

Plaintiffs argue that evidence regarding (1) information about other suspects, (2) information about witness Thomas Drummond's arrest for a bar robbery, (3) Ruiz's knowledge of the second bar robbery, and (4) improper redaction of Plaintiffs' co-conspirators' statements were intentionally concealed. Am. Compl. at ¶¶ 46, 47, 56. The City asserts that these acts cannot serve as the basis for a constitutional violation because they are not supported by competent evidence and are undermined by the evidence of record. MSJ at 13.

### i.    Evidence of Other Suspects

Plaintiffs allege that evidence of other suspects was intentionally suppressed during their criminal trial. Plaintiffs point to incident reports, discovered during a post-conviction inspection of Ruiz's files, that included anonymous tips identifying individuals named "Keith" and "Mohammad" as potential alternative suspects in the Azcona murder. Resp. at 9. The tips included the following: (1) a report reflecting that "kids on the block by store saying Keith did it[,]" (2) a police radio report that an anonymous caller said that "Keith" was the killer at 3000 York Street, (3) a phone tip from an individual named Michael Lee that stated, "[w]e got the cash

register, and Mohammad shot him in the face[,]" and (4) two additional notes in the homicide file that named Keith Alexander as a suspect.  Am. Compl. at ¶¶ 44-46.

The City argues that the information about other suspects is not admissible because it is predicated on handwritten notes taken in response to anonymous tips.  MSJ 14.  The City further contends that even if the information was admissible, it does not undermine Plaintiffs' involvement in the Azcona murder because the anonymous tips are refuted by two eyewitness statements and Jackson's testimony.  Id.

This Court is unwilling to credit the legitimacy of the anonymous tips in the absence of any Third Circuit or Supreme Court precedent that holds that the failure to turn over anonymous tips may substantiate a deliberate deception claim or otherwise violates a defendant's constitutional rights.  The anonymous tips may not serve as the basis for Plaintiffs' deliberate deception claim.

### ii.    Drummond's Prior Arrest

Plaintiffs argue that the government failed to disclose reports that reflected that Thomas Drummond, who provided information against Plaintiffs, was arrested for the bar robbery the day before he contacted the police.  Resp. at 9.

The City argues that information about Drummond's arrest does not support a suppression claim because Plaintiffs knew of the arrest as early as the preliminary hearing, nine months prior to Plaintiffs' trial, and cross-examined Drummond as to his criminal history, with a specific emphasis on the robbery.  MSJ at 15.

A review of the trial record shows that Plaintiffs were made aware of Drummond's arrest for the bar robbery, at least by the time of trial.  Drummond was cross-examined as to his criminal history, including his arrest for the bar robbery.  See Drummond Preliminary Hearing

Testimony at 76-77, 79-89, MSJ Ex. 12.  Plaintiffs' deliberate deception claim cannot be predicated on the withholding of Drummond's arrest history.[7]

### iii.    Ruiz's Knowledge of the Second Bar Robbery

Plaintiffs assert that all individual defendants, including Ruiz, intentionally concealed incident reports regarding the second bar robbery.  Am. Compl. at ⁋ 91.  The City argues that Ruiz did not conceal the reports because "the record shows that information related to the bar shooting was passed to Plaintiffs' counsel by the ADA, at trial during the cross-examination of Jackson."  MSJ at 13.

That Ruiz was in possession of the incident reports from the second bar robbery creates a genuine question as to whether Ruiz intentionally concealed evidence to secure a conviction. Ruiz is entitled to absolute immunity, as the Supreme Court held, inter alia, in Imbler v. Pachtman, that prosecutors are immune from claims that they deliberately suppressed exculpatory evidence.  424 U.S. 409, 416 (1976).  However, Ruiz's immunity does not change the fact that the right to a fair trial is violated when the government conceals or suppresses relevant and material evidence.  See Dennis v. City of Phila., 19 F.4th 279, 290-91 (3d Cir. 2021). This Court's prior finding that Ruiz is entitled to absolute immunity did not resolve the question of whether Ruiz intentionally concealed incident reports of the second bar robbery.  The City's argument that Ruiz could not have intentionally concealed this information because she provided it to Plaintiffs' counsel at trial does not satisfy the due process requirement that exculpatory material be disclosed "in time for its effective use at trial."  Higgs, 713 F.2d at 44-45.  There is a

---

[7] To the extent that Plaintiffs argue that Drummond's arrest for the bar robbery was not made known to them before the preliminary hearing, this has not been specifically pled.  Additionally, "[n]o denial of due process occurs if Brady material is disclosed [] in time for its effective use at trial."  U.S. v. Higgs, 713 F.2d 39, 44-45 (3d Cir. 1983). Disclosure by the Preliminary Hearing satisfies this requirement.

genuine question of material fact as to when Plaintiffs received information regarding the second bar robbery and whether Ruiz intentionally concealed the incident reports.

### iv.    Co-Conspirators' Statements

Lastly, Plaintiffs assert that Ruiz introduced statements from Plaintiffs non-testifying co-conspirators that were otherwise prohibited by <u>Bruton</u>.  Resp. at 10.  Plaintiffs contend that the statements were not uniformly redacted and repeatedly used to corroborate Jackson's testimony. <u>Id.</u>

The City argues that no information underlying the co-conspirators' statements were intentionally withheld from Plaintiffs, proven by the fact that the statements were discussed at length when deciding whether to sever Plaintiffs' trial from that of their co-conspirators.  MSJ at16.  The City also contends that whether Ruiz violated <u>Bruton</u> in arguing that the co-conspirators' statements corroborated Jackson's testimony was already litigated on direct appeal. <u>Id.</u> at 16-17.

The City is correct that Plaintiffs' argument regarding their co-conspirators' statements is not a claim of deliberate deception.  MSJ at 16.  The statements were not intentionally concealed from Plaintiffs' but rather redacted for the jury.  The statements were discussed at length during an August 14, 1995, Hearing where Plaintiffs' trial counsel argued that their case should be severed from that of their co-conspirators, Finney, Jenkins, and Womack, because unlike their co-conspirators, Plaintiffs did not provide statements.  See MSJ at 16, Ex. 15.  Plaintiffs' deliberate deception claim cannot be predicated on the redaction of their co-conspirators' statements.

If Plaintiffs establish at trial that (1) Jackson proffered false testimony, or (3) Ruiz intentionally concealed incident reports of the second bar robbery they may be able to establish the requisite underlying constitutional violation on which to predicate their <u>Monell</u> claims.

14

**B.  Civil Rights Conspiracy (Count II)**

Plaintiffs allege that the individual Defendants conspired to deliberately deceive Plaintiffs' trial counsel and the court by concealing relevant and material evidence, fabricating, and tampering with evidence, coercing witnesses, and conducting an inadequate investigation. Am. Compl. at ¶ 96.

The City argues that there is no record evidence to substantiate Plaintiffs' civil conspiracy claim because there is no underlying constitutional violation and conspiracy is a derivative claim. MSJ at 17.

To succeed on a § 1983 conspiracy claim a plaintiff must establish an underlying § 1983 violation, that is "that the object of the conspiracy was the deprivation of a federally protected right." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 295 (3d Cir. 2018) (internal citations omitted).  Once an underlying § 1983 violation has been established, a plaintiff must "provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  Id.

In the Memorandum Opinion granting individual Defendants' Motion to Dismiss, this Court abstained from ruling on the merits of Plaintiffs' claim that Walsh, Tomaino, and Ruiz conspired for the purpose of coordinating Walsh and Tomaino's allegedly false trial testimony, instead dismissing the claim based on absolute immunity.  Gainey, 704 F.Supp.3d at 603. However, a further review of the record shows that Walsh and Tomaino's testimony regarding the incident reports of the second bar robbery was not false.  Similarly, this Court dismissed the conspiracy claim against Walsh, Tomaino, and Ruiz in all other respects for failing to plead sufficient facts to demonstrate the elements of conspiracy.  Id.  To date, Plaintiffs have not provided further proof of this claim.  The record prevents Plaintiffs from establishing that Walsh

or Tomaino proffered false testimony regarding the incident reports and Plaintiffs have provided no further evidence that Walsh, Tomaino, or Ruiz conspired in any other way.  As such, Plaintiffs cannot establish a § 1983 conspiracy.  Summary judgment is granted as to Plaintiffs' § 1983 conspiracy claim.

### C.  Failure to Intervene (Count III)

Plaintiffs assert that the individual Defendants had the opportunity to intervene to prevent the deliberate deception of Plaintiffs and the court but failed to do so.  Am. Compl. ₱ 99.  The City correctly asserts that the Third Circuit has not recognized a failure to intervene claim as it pertains to claims of deliberate deception.  Id. at 19.

As noted in its Motion to Dismiss Memorandum regarding the individual Defendants, the Third Circuit has yet to recognize a failure to intervene claim outside of the excessive force context.  See Brown v. Harris, 2022 WL 824236, at *5 (E.D. Pa. Mar. 18, 2022) (Baylson); Ogrod v. City of Phila., 598 F.Supp.3d 253, 273 (E.D. Pa. 2022) (Padova).  This Court declines to do so here.  Summary judgement is granted as to Plaintiffs' failure to intervene claim.

### D.  Monell Claim (Count IV)

Plaintiffs bring a Monell claim against the City to impose municipal liability for the individual Defendants' actions.  Plaintiffs' assert two bases for the City's liability, (1) unconstitutional custom, and (2) failure to train, supervise, or discipline.  The City argues that Plaintiffs have not substantiated their claim of municipal liability.  MSJ at 20.

When a suit brought under § 1983 names a municipality as a defendant, the suit may not proceed under a theory of respondeat superior—that is, where the employer or principal is held liable for the wrongful acts of its employees.  Such a case must proceed under the theory of liability prescribed by the U.S. Supreme Court in Monell.  To establish a Monell claim against a

municipality a plaintiff must show (1) a deprivation of a federal right, City of Los Angeles v. Heller, 475 U.S. 796, 699 (1986); (2) a relevant policy or custom attributable to the City, Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978); and (3) "a direct causal link" between the municipal action and the deprivation of the federal right, Bd. of Comm'rs of Bryan Cnty., v. Brown, 520 U.S. 397, 404 (1997).  The municipality is liable when either the policy or custom facially violates the Constitution, or if not unconstitutional itself, is the "moving force" behind the constitutional violation.  Thomas v. Cumberland Cnty., 749 F.3 217, 222 (3d Cir. 2014).  As explained, Plaintiffs have adequately pled a constitutional violation for deliberate deception in violation of the Fourteenth Amendment.

The acts of an employee are considered the result of a municipal policy or custom where (1) "the appropriate officer or municipality promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy;" (2) "no rules have been announced as policy but federal law has been violated by an act of the policymaker itself;" or (3) the "policymaker has failed to act affirmatively at all, [though] the need to take some action to control the municipality's agents is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal citations omitted).

Thus, Plaintiffs may establish the City's liability by showing that their injuries were caused by (1) an unconstitutional policy or custom of the City, or (2) a failure or inadequacy by the City that reflects a deliberate or conscious choice.  See Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019).  While custom and failure to train claims are closely related, "the avenues remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to

17

an unconstitutional policy or custom, and a plaintiff alleging failure to supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." Id.

### 1. Unconstitutional Policy

Plaintiffs contend that the PPD had a policy, practice, or custom, of among other things,[8] fabricating and planting evidence, fabricating witness and suspect statements, concealing and/or failing to disclose exculpatory evidence, and failing to conduct a reasonably thorough and fair investigation. Am. Compl. at ¶ 103. Plaintiffs further allege that policymakers for the City were on notice of these policies, practices, or customs but failed to undertake any meaningful investigation. Id.

The City argues that Plaintiffs cannot establish an unconstitutional policy because rather than an absence of City policies, the City had multiple policies, including ones specifically applicable to the (1) investigations of homicides, (2) rules of discovery relating to the disclosure of evidence, and (3) obligation of officers to report corruption and misconduct. MSJ at 23.

A "policy" is an official proclamation or edict of a municipality. See Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). Plaintiffs point to no official City policy. The City is correct, it is undisputed that Plaintiffs fail to establish that an unconstitutional policy caused the alleged violation of their constitutional rights. As such, this Court must determine whether Plaintiffs can establish that an unconstitutional custom caused their harm.

---

[8] Plaintiffs also allege that there was a policy, practice, or custom of using coercive interview techniques. This Court reviews only the allegations relevant to Plaintiffs' deliberate deception claim.

## 2. Unconstitutional Custom

The City asserts that Plaintiffs likewise cannot establish that an unconstitutional City custom caused their harm, and that even if such a custom existed, the City was not deliberately indifferent.  MSJ at 24.

A "custom" is a practice that is "so permanent and well settled as to virtually constitute law."  Beck, 89 F.3d at 971.  A custom may be established by "evidence of knowledge and acquiescence."  Id.  "A plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  "This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence.  Practices 'so permanent and well settled as to have the force of law [are] ascribable to municipal decisionmakers.'"  Id. (quoting Anela v. City of Wildwood, 790 F.2d 1063, 1067 (3d Cir. 1986)).  Thus, even if a custom "has not been formally approved by an appropriate decisionmaker" it "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  Bryan Cnty., 520 U.S. at 404.

### i. Sufficiency of Evidence

Plaintiffs have identified the following evidence in support of a municipal custom to fabricate and plant evidence, fabricate witness and suspect statements, conceal and/or fail to disclose exculpatory evidence, and fail to conduct reasonably thorough and fair investigations:

- Nine homicide cases from the 1990s, that have since been vacated or overturned.  In the cases of Anthony Wright, Andrew Swaison, Johnny Berry, Shaurn and Mustafa Thomas, Jackie Combs Jr., Chester Hollman, Terrence Lewis, and Pedro Alicea, fabricated

evidence was used to secure the convictions or exculpatory evidence was withheld from the criminal defendants (Pl's 1st Supp. Br. at 4-11);[9]

- A case in which a court in this district found that during the late 1980's and early 1990's a PPD Narcotics Unit engaged in "widespread unconstitutional practices," including fabrication and concealment of evidence, that culminated in a Consent Decree that required the PPD to enact wide ranging reforms (Am. Compl. at ¶¶ 86-87);

- Detective Tomaino's deposition testimony that admitted that information sometimes "slip[ped] through the cracks[;]"[10]

- Three instances in the 1980s in which federal courts enjoined the PPD's unconstitutional investigatory practices;[11]

- A 1977 <u>Philadelphia Inquirer</u> investigative report titled "The Homicide Files" that exposed a pattern of misconduct by homicide detectives that mirrored the alleged unlawful conduct in Plaintiffs' case, including the fabrication of evidence (Am. Compl. at ¶ 81).

---

[9] Plaintiffs cite to sixteen cases in total. This Court only references the cases where convictions were obtained through fabricated evidence or the suppression of exculpatory evidence. The additional seven cases cited by Plaintiffs largely deal with coerced confessions and are not relevant to the asserted unconstitutional custom that allegedly caused Plaintiffs' injuries.

[10] Tomaino's testimony described where and when officers' notes would be included in official files. Tomaino explained that officers' investigatory notes would be included in the "homicide folder" but not the "homicide binder" that would be entered into evidence. Tomaino Dep. 49:2-7. Tomaino confirmed that when the Special Investigations Unit (SIU) took over a case they would be provided with the homicide folder that included the officers' notes. <u>Id.</u> 49:9-14. However, Tomaino went on to explain that officers were not always able to answer the SIU's questions and that "[n]ot everything is checked the way you think it gets checked" because of the vast amount of information coming in. <u>Id.</u> at 50:8-12. Tomaino testified that "sometimes when that information starts coming in, it is coming in like a fire hose. I mean, it is just, like, there is tremendous, tremendous amounts of information coming in and you try to record it all. But I am sure some of it must slip through the cracks. It is what it is." <u>Id.</u> at 50:8-16.

[11] <u>See Cliett v. City of Phila.</u>, No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of the unconstitutionality of "Operation Cold Turkey," during which 1,500 individuals were unlawfully subjected to search and arrest); <u>Spring Garden United Neighbors v. City of Phila.</u>, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining the police sweep of Latinos in the Spring Garden area in the aftermath of a shooting of a police officer); <u>Arrington v. City of Phila.</u>, No. 88-2264 (E.D. Pa. 1988) (enjoining the stop and searches of young African American males during the investigation of the "Center City Stalker").

The City does not dispute the substance of Plaintiffs evidence, but rather its sufficiency. The City specifically takes issue with evidence of other homicide convictions, on the basis that they are uncited and were not developed during discovery, and the <u>Philadelphia Inquirer</u> report, because it is not in the record, it was not substantiated by other evidence during discovery, and it is sufficiently dated as to be irrelevant for determining liability.  MSJ at 24-25.

The evidence cited by Plaintiffs is sufficient to survive summary judgment.  As to the evidence of other overturned homicide convictions, courts in this circuit have accepted similar numbers of incidents as evidence of a custom and have been more prone to do so when such evidence is accompanied by additional support, such as the deposition testimony of officers.  <u>See Beck</u>, 89 F.3d at 969-70 (evidence of five civilian complaints detailing similar uses of excessive force within five years of the plaintiff's injury was sufficient to establish a pattern).  Here, Plaintiffs cite to nine cases that this Court finds to be analogous, accompanied by Tomaino's deposition testimony that evidence sometimes "slip[ped] through the cracks."  Tomaino Dep. at 50:8-16.  Moreover, another court in this district has previously found that an overlapping list of homicide cases was sufficient to survive summary judgment, when taken in conjunction with other evidence.  <u>See Thomas v. City of Phila.</u>, 2019 WL 4039575, at *20 (E.D. Pa. Aug. 27, 2019) (Pratter).  Similarly, at summary judgment courts in this district have held that the same <u>Philadelphia Inquirer</u> report was "the first link in a chain of evidence suggesting a publicly disclosed pattern of misconduct in the Department that allegedly continued before, during, and after [the early 1990's,]" <u>Id.</u> at *19.[12]  Additionally, in reversing a district court's grant of

---

[12] <u>See also Swainson v. City of Phila.</u>, 2023 WL 144283, at *5 (E.D. Pa. Jan. 10, 2023) (Pratter) (denying motion to dismiss where plaintiff provided evidence of newspaper articles, government investigations, and other instances of police misconduct because such evidence was relevant to the existence of a City custom); <u>Harris v. City of Phila.</u>, 171 F.Supp.3d 295, 402-03 (E.D. Pa. 2016) (Kelly) (denying City's motion for judgment on the pleadings where Plaintiff cited to three other cases of excessive force by the PPD and a Department of Justice Report that found that the City's defensive tactics training needed to be updated to include in-service training); <u>Cf Dennis v. City of Phila.</u>,

21

dismissal, the Third Circuit held that newspaper articles, press releases, and consent decrees are sufficient to plead a <u>Monell</u> claim. <u>Estate of Roman v. City of Newark</u>, 914 F.3d 789, 799 (3d Cir. 2019) (holding that plaintiff established a custom of constitutional violations during arrests, in part based on a consent decree that was not yet in effect during plaintiff's arrest, but that acknowledged that such a custom existed, even if it post-dated plaintiff's alleged harm).

Plaintiffs have identified sufficient evidence that a reasonable jury could find that there was a municipal custom to fabricate and plant evidence, fabricate witness and suspect statements, conceal and/or fail to disclose exculpatory evidence, and fail to conduct reasonably thorough and fair investigations.[13]

### ii.    Deliberate Indifference

Next, the City argues that even if there is enough evidence to establish an unconstitutional custom, Plaintiffs cannot establish that the City was deliberately indifferent. The available record discloses otherwise. As discussed above, Plaintiffs presented evidence of supposedly similar misconduct in the years surrounding their arrest. Additionally, the <u>Philadelphia Inquirer</u> report, which predated Plaintiffs' trial by nine years, the consent decree enjoining PPD's practice arising out of misconduct by a narcotics unit, and multiple cases in the 1980s where federal courts enjoined the PPD's use of unconstitutional investigatory tactics put the City on notice that a custom of fabricating and concealing evidence existed.

That Plaintiffs do not identify a final municipal decisionmaker is not fatal to their claim. A reasonable jury could find that the custom of fabricating and concealing evidence was "so

---

2024 WL 1604207, at *5 (E.D. Pa. Apr. 12, 2024) (Sánchez) (holding that the same <u>Inquirer</u> article could not be used as evidence to substantiate a <u>Monell</u> claim at summary judgment), *on appeal*.

widespread as to have the force of law" and that the City's failure to address this misconduct amounted to deliberate indifference.  Bryan Cnty., 520 U.S. at 404.

    **iii.**    **Causation**

       Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find from this evidence that the City had a custom to fabricate and plant evidence, fabricate witness and suspect statements, conceal and/or fail to disclose exculpatory evidence, and fail to conduct reasonably thorough and fair investigations, and by its inaction was deliberately indifferent, and thus in part complicit in the misconduct that ensued.  A reasonable jury could find evidence in the record connecting the fabrication and concealment of evidence to Plaintiffs' alleged constitutional injuries.  For example, Plaintiffs' allege that they were not provided incident reports of the second bar robbery prior to trial.  Evidence that a similar crime was committed in which Plaintiffs were not involved may have helped establish their defense or provided reasonably doubt to the jurors.  Even if the deliberate deception claim against the individual Defendants was dismissed on the merits, as opposed to on immunity grounds, a reasonable jury could find that this testimony is evidence of the City's custom to fabricate and conceal evidence.  See Mervilus, 73 F.4th at 196-97 ("Where it is possible for the Monell defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the Monell defendant liable.") (citing Speer v. City of Wynne, 276 F.3d 980, 985–86 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.")).  The Motion for Summary Judgment is denied as to Plaintiffs' Monell claim predicated on an unconstitutional custom.

### 3. Failure to Train or Failure to Discipline or Supervise

Plaintiffs allege that the City, through the PPD, failed to properly train its employees by failing to appropriately discipline officers, failing to train officers "with respect to the constitutional limitations on their ... powers," ignoring systemic patterns of police misconduct, and failing to sanction or discipline officers who were aware of other officers' misconduct. Am. Compl. at ¶¶ 88b-e. Plaintiffs also allege that the City was "deliberately indifferent to the need to train, supervise, and discipline police officers." Id. at ¶ 89.

The City argues that Plaintiffs cannot establish a failure to train, supervise, or discipline claim because Plaintiffs have not identified a specific training that the City should have offered or a policymaker that chose to forego such training. MSJ at 26, 28.

A Monell claim predicated on failure to train, supervise, or discipline must establish that the municipality's failure "amounts to a deliberate indifference [as] to the rights of persons with whom . . . employees will come into contact." Johnson v. City of Phila., 974 F.3d 394, 403 (3d Cir. 2020). "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Forrest, 930 F.3d at 106.

#### i. Failure to Train

To establish a failure to train claim plaintiffs "must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind occurred." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir. 1991).

Plaintiffs assert that it was the City's custom to fabricate and plant evidence, fabricate witness and suspect statements, conceal and/or fail to disclose exculpatory evidence, and fail to conduct reasonably thorough and fair investigations.  Plaintiffs do not identify any specific training that the City failed to provide or how such a training would have prevented their injuries.  The Motion for Summary Judgment is granted as to Plaintiffs' Monell claim predicated on a failure to train.

### ii.    Failure to Supervise or Discipline

To establish a failure to supervise claim a plaintiff must identify a specific supervisory practice that the defendant failed to employ as well as "(1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar conduct, and (2) circumstances under which the supervisor's action could be found to have communicated a message of approval."  Langweiler v. Borough of Newtown, 2011 WL 1809264, at *5 (E.D. Pa. May 12, 2011) (Baylson) (citing C.H. ex rel. Z.H. v. Olivia, 226 F.3d 198, 202 (3d Cir. 2000) (en banc)).  Plaintiff must do more than merely "argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did."  Sample, 885 F.2d at 1118.  In sum, plaintiffs must demonstrate that the supervisor's action or inaction was the "moving force [behind] the constitutional violation."  Ricker v. Weston, 27 F.App'x 113, 119 (non-precedential) (quoting City of Canton v. Harris, 489 US 378, 391 (1989)).

Plaintiffs do not identify the requisite supervisory practice that the City failed to employ.  The closest that Plaintiffs come to identifying a supervisory practice is that the City "fail[ed] to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers."  Am. Compl. at ⁋ 88(c).  This is not

sufficiently specific.[14]  Further, Plaintiffs have not alleged that the action or inaction of any specific supervisor was the moving force that denied them a fair trial.  The Motion for Summary Judgment is granted as to Plaintiffs' <u>Monell</u> claim predicated on a failure to supervise, or discipline.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, City Defendant's Motion for Summary Judgment is granted in part and denied in part.  The Motion for Summary Judgment is **GRANTED** as to Count II (§ 1983 Conspiracy), Count III (Failure to Intervene), and Count IV (<u>Monell</u> claim, as it is predicated on an unconstitutional policy or a failure to train, supervise, or discipline).  The Motion for Summary Judgment is **DENIED** as to Count I (Deliberate Deception) and Count IV (<u>Monell</u> claim, as it is predicated on an unconstitutional custom).  This Court notes that Plaintiffs sufficiently state, if just barely, a Fourteenth Amendment deliberate deception and <u>Monell</u> claim premised on an unconstitutional custom.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 22\22-4143 Gainey et al v. Philadelphia et al\22-4143 MSJ Opinion.docx

---

[14] <u>See Acosta v. Democratic City Comm.</u>, 288 F.Supp.3d 597, 642 (E.D. Pa. 2018) (Slomsky) (allegation that the City failed to ensure that the election was held fairly and in compliance with the Pennsylvania Election Code was insufficiently specific to survive a motion to dismiss); <u>MGJ v. Sch. Dist. of Phila.</u>, 2017 WL 2277276, at *10 (E.D. Pa. May 25, 2017) (Kearney) (allegations that the district failed to properly supervise employees as to the risks associated with their action or inaction and on the areas of sexual harassment, bullying, and intimidation were not sufficiently specific to survive a motion to dismiss).